# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF TEXAS
# MIDLAND DIVISION

| | |
|---|---|
| BRYAN TRAHAN, Individually and For Others Similarly Situated,<br><br>v.<br><br>DIAMONDBACK ENERGY, INC. | Case No. 7:22-cv-00207<br><br>Jury Trial Demanded<br><br>Collective Action |

## ORIGINAL COMPLAINT

### SUMMARY

1. Bryan Trahan (Trahan) brings this lawsuit to recover unpaid overtime wages and other damages from Diamondback Energy, Inc. (Diamondback) under the Fair Labor Standards Act (FLSA). *See* 29 U.S.C. § 201 *et seq.*

2. Trahan worked for Diamondback as a Drilling Consultant from November 2017 until May 2020.

3. Trahan and the other similarly situated workers who worked for Diamondback in the last three years regularly worked more than 40 hours a week.

4. But these workers never received overtime for the hours they worked in excess of 40 hours in a single workweek.

5. Instead of receiving overtime as required by the FLSA, Diamondback classified Trahan and other similarly situated workers as independent contractors.

6. Trahan and the workers similarly situated to him were paid a flat amount for each day worked for Diamondback without overtime compensation.

7. Neither Trahan, nor any other similarly situated workers who worked for Diamondback and received a day-rate, received a guaranteed salary.

8. This collective action seeks to recover the unpaid overtime wages and other damages owed to these workers.

## JURISDICTION & VENUE

9. This Court has original subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action involves a federal question under the FLSA. 29 U.S.C. § 216(b).

10. Venue is proper under 28 U.S.C. § 1391(b).

11. Diamondback conducts substantial business operations in this District and Division.

12. Diamondback's corporate headquarters is located in this District and Division.

## PARTIES

13. Trahan worked for Diamondback as a Drilling Consultant from November 2017 until May 2020.

14. Throughout his employment with Diamondback, Trahan was classified as an independent contractor and paid a day-rate with no overtime compensation.

15. Trahan's relationship with Diamondback was an employer/employee relationship.

16. Trahan's written consent is attached as Exhibit A.

17. Trahan brings this action on behalf of himself and all other similarly situated workers who were classified as independent contractors and paid by Diamondback's day-rate system.

18. Although these workers regularly worked more than 40 hours each week, these workers were only paid a flat amount for each day worked and with no overtime compensation for the hours they worked in excess of 40 each week in violation of the FLSA.

19. The collective of similarly situated employees or putative class members sought to be certified is defined as follows:

> **All Drilling Consultants working on behalf of, Diamondback Energy, Inc. who were classified as independent contractors and paid a day-rate with no overtime at any time during the past three (3) years** (the Putative Class Members).

20. The Putative Class Members are easily ascertainable from Diamondback's business and personnel records.

21. Diamondback is a Delaware corporation and may be served by serving its registered agent for service of process, **Corporation Service Company d/b/a CSC – Lawyers Inco, 211 E. 7th St., Suite 620, Austin, Texas 78701**, or wherever it may be found.

## COVERAGE UNDER THE FLSA

22. At all relevant times, Diamondback has been an employer within the meaning of the Section 3(d) of the FLSA. 29 U.S.C. § 203(d).

23. At all relevant times, Diamondback has been an enterprise within the meaning of Section 3(r) of the FLSA. 29 U.S.C. § 203(r).

24. At all relevant times, Diamondback has been an enterprise engaged in commerce or in the production of goods for commerce within the meaning of Section 3(s)(1) of the FLSA, 29 U.S.C. § 203(s)(1). Diamondback has and has had employees engaged in commerce or in the production of goods for commerce, or employees handling, selling, or otherwise working on goods or materials – such as tools, cell phones, and oilfield equipment - that have been moved in or produced for commerce.

25. In each of the last three years, Diamondback has had annual gross volume of sales made or business done of at least $1,000,000.

26. At all relevant times, Trahan and the Putative Class Members were engaged in commerce or in the production of goods for commerce.

27. Diamondback treated Trahan and the Putative Class Members as employees and uniformly dictated the pay practices applied to Trahan and the Putative Class Members.

28. Diamondback's misclassification of Trahan and the Putative Class Members as independent contractors does not alter their status as employees for purposes of the FLSA.

29. Diamondback's uniform day-rate scheme, depriving its workers of overtime compensation for weeks in which these workers work over 40 hours is, in of itself, a violation of the FLSA. 29 U.S.C. § 207(a) & (e).

## FACTUAL ALLEGATIONS

30. Diamondback is one of the largest independent oil and gas companies in the Permian Basin.

31. To provide services, Diamondback hired drilling consultants (like Trahan) to work on its behalf.

32. Diamondback classified its drilling consultants as independent contractors.

33. But Diamondback did not hire these workers on a project-by-project basis.

34. Rather, Diamondback hired and treated these workers just like regular, even if sometimes short-term, employees.

35. During the relevant period, Trahan and the Putative Class Members regularly worked for Diamondback in excess of 40 hours a week for weeks at a time.

36. During the relevant period, Trahan and the Putative Class Members worked for Diamondback on a day-rate basis.

37. During the relevant period, Trahan and the Putative Class Members were not paid overtime for the hours they worked for Diamondback in excess of 40 hours each week.

38. These workers make up the proposed Putative Class.

39. Diamondback subjected all Drilling Consultants to the same or similar illegal pay practices for similar work.

40. Trahan would report to Diamondback management-level employees.

41. Trahan was the face of Diamondback at the drilling site.

42. Throughout his employment with Diamondback, Trahan regularly worked more than 40 hours each week without receiving overtime compensation. Instead, Trahan was paid a day-rate for each day worked, regardless of how many hours he worked in a day or week.

43. Trahan regularly worked more than 12 hours each day.

44. Trahan normally worked 2 weeks on and 2 weeks off.

45. While working, Trahan was on call 24 hours a day.

46. Trahan's relationship with Diamondback was clearly one of an employer/employee.

47. Trahan's work was governed entirely by Diamondback.

48. The Putative Class Members performed the same general job duties performed by Trahan.

49. Diamondback's drilling consultants provided onsite assistance with drilling operations and coordinated with the rig crew to ensure drilling was going according to Diamondback's drilling program.

50. Neither Trahan nor the Putative Class Members could stray from Diamondback's drilling program.

51. The Putative Class Members worked the same or similar schedule worked by Trahan, regularly working more than 84 hours each week. Trahan's work schedule is typical of the Putative Class Members.

52. During the relevant period, Diamondback classified Trahan and the Putative Class Members as independent contractors and paid them a day-rate basis with no overtime compensation.

53. Trahan and the Putative Class Members never received a salary.

54. Trahan and the Putative Class Members received a day-rate regardless of the number of hours or days they worked in a week, even if they worked more than 40 hours in a workweek.

55. Without the job performed by Trahan and the Putative Class Members, Diamondback would not have been able to complete its business objectives.

56. Trahan and the Putative Class Members were economically dependent on Diamondback and relied on Diamondback for work and compensation.

57. Diamondback determined the amount and type of compensation paid to Trahan and the Putative Class Members.

58. Diamondback set Trahan's and the Putative Class Members' rates of pay, their work schedules, and effectively prevented them (or outright prohibited them) from working other jobs for other companies while they are working on jobs for Diamondback.

59. Trahan and the Putative Class Members worked in accordance with the schedule set by Diamondback.

60. Diamondback prohibited Trahan and the Putative Class Members from subcontracting out the work they are assigned by Diamondback.

61. Trahan and the Putative Class Members had to follow Diamondback's policies and procedures.

62. Trahan and the Putative Class Members had to follow Diamondback's drilling program.

63. Trahan and the Putative Class Members' had to adhere to the quality standards put in place by Diamondback.

64. Trahan and the Putative Class Members did not substantially invest in the equipment or tools required to complete the overall job to which they were assigned. Instead, Diamondback provided Trahan and the Putative Class Members with the equipment, programs, and facilities necessary for them to perform the work required of them.

65. Trahan and the Putative Class Members did not provide the significant equipment and programs they worked with daily, such as the oilfield equipment, office space, computers, and other necessary equipment.

66. Diamondback made these large capital investments in buildings, machines, equipment, tools, and supplied the business in which Trahan and the Putative Class Members work.

67. Trahan and the Putative Class Members do not incur operating expenses like rent, payroll, marketing, and insurance.

68. Trahan and the Putative Class Members did not market their services while employed by Diamondback.

69. While employed by Diamondback, Trahan and the Putative Class Members worked exclusively for Diamondback.

70. Diamondback set Trahan's and the Putative Class Members' work schedule, which prohibited them from working other jobs for other companies while working on jobs for Diamondback.

71. At all relevant times, Diamondback maintained control, oversight, and direction of Trahan and the Putative Class Members, including, but not limited to, hiring, firing, disciplining, timekeeping, payroll, and other employment practices.

72. Diamondback controlled Trahan's and the Putative Class Members' pay.

73. Likewise, Diamondback controlled Trahan's and the Putative Class Members' work.

74. Trahan's and the Putative Class Members' work had to adhere to the quality standards put in place by Diamondback.

75. Trahan and the Putative Class Members were not required to possess any unique or specialized skillset (other than that maintained by all other workers in their respective position) to perform their job duties.

76. Diamondback knew Trahan and the Putative Class Members regularly worked for 12 or more hours a day for weeks at a time.

77. Diamondback's records reflect the fact that Trahan and the Putative Class Members regularly worked far in excess of 40 hours in certain workweeks.

78. Trahan and the Putative Class Members did not receive overtime for hours worked in excess of 40 in any of those weeks. Instead, Trahan and the Putative Class Members were paid on a day rate basis.

79. Diamondback set these workers' schedules and compensation; supervised them; and required them to adhere to strict guidelines, directives, and Diamondback's policies and procedures.

80. The work Trahan and the Putative Class Members performed was an essential part of Diamondback's core businesses.

81. Diamondback controlled Trahan's and the Putative Class Members' opportunities for profit and loss by dictating the days and hours they worked and the rates and method in which they were paid.

82. Diamondback controlled all the significant or meaningful aspects of the job duties Trahan and the Putative Class Members performed by requiring them to strictly adhere to Diamondback's directives, policies, procedures, and drilling program.

83. Even though Trahan and the Putative Class Members may have worked away from Diamondback's offices without the constant presence of Diamondback supervisors, Diamondback still controlled significant aspects of their job activities by enforcing mandatory compliance with its policies, procedures, and drilling program.

84. The daily and weekly activities of Trahan and the Putative Class Members were routine and largely governed by standardized plans, procedures, and checklists created by Diamondback.

85. Diamondback uniformly denied Trahan and the Putative Class Members overtime for the hours they worked in excess of 40 hours in a single workweek.

86. Trahan and the Putative Class Members were not employed on a salary basis.

87. Diamondback knew Trahan and the Putative Class Members worked more than 40 hours in a week.

88. As a result, Diamondback failed to pay the Putative Class Members proper overtime compensation for hours worked in excess of 40 in a workweek.

89. Diamondback knew, or showed reckless disregard for, whether the Putative Class Members were entitled to overtime under the FLSA.

90. Diamondback has been sued for this same day rate pay practice before.

91. Nonetheless, Trahan and the Putative Class Members were not paid overtime for while working for Diamondback.

92. Diamondback was aware of the requirements of the FLSA.

93. Diamondback did not investigate the legality of its classification of Trahan and the Putative Class Members as exempt from overtime pay or if they were Diamondback's employees.

94. Diamondback did not conduct any time studies of the exempt and non-exempt job duties performed by Trahan and the Putative Class Members.

95. Diamondback recklessly disregarded its FLSA obligations by employing Trahan and the Putative Class Members on a day rate basis.

96. Diamondback knew, or showed reckless disregard for whether, Trahan and the Putative Class Members were improperly classified as independent contractors (as opposed to employees).

97. Diamondback willfully violated the FLSA.

### COLLECTIVE ACTION ALLEGATIONS

98. Trahan brings this claim as a collective action under the FLSA.

99. The Putative Class Members were victimized by Diamondback's pattern, practice, and/or policy which was in willful violation of the FLSA.

100. Other Putative Class Members worked with Trahan and indicated they were classified and paid in the same manner (as independent contractors paid a day-rate with no overtime) and performed similar work.

101. Based on his experiences with Diamondback, Trahan is aware that Diamondback's illegal practices were imposed on the Putative Class Members.

102. The Putative Class Members are similarly situated in all relevant respects.

103. The Putative Class Members are blue-collar workers.

104. Even if their precise job duties might vary somewhat, these differences do not matter for the purposes of determining their entitlement to overtime.

105. The illegal day-rate policy that Diamondback imposed on Trahan was likewise imposed on all Putative Class Members.

106. Numerous individuals were victimized by this pattern, practice, and policy which was in willful violation of the FLSA.

107. The Putative Class Members were similarly denied overtime when they worked more than 40 hours per week.

108. The overtime owed to Trahan and the Putative Class Members will be calculated using the same records and using the same formula.

109. Trahan's experiences are therefore typical of the experiences of the Putative Class Members.

110. The specific job titles or precise job locations of the various members of the Putative Class do not prevent collective treatment.

111. Trahan has no interests contrary to, or in conflict with, the Putative Class Members that would prevent class or collective treatment.

112. Like each Putative Class Member, Trahan has an interest in obtaining the unpaid overtime wages owed under federal law.

113. A collective action, such as the instant one, is superior to other available means for fair and efficient adjudication of the lawsuit.

114. Absent a collective action, many Putative Class Members will not obtain redress of their injuries and Diamondback will reap the unjust benefits of violating the FLSA.

115. Further, even if some of the Putative Class Members could afford individual litigation against Diamondback, it would be unduly burdensome to the judicial system.

116. Concentrating the litigation in one forum will promote judicial economy and parity among the claims of the Putative Class Members, as well as provide judicial consistency.

117. The questions of law and fact that are common to each Putative Class Member predominate over any questions affecting solely the individual members.

118. Among the common questions of law and fact are:

   a. Whether Diamondback employed the Putative Class Members within the meaning of the FLSA;

   b. Whether Diamondback's decision to pay a day-rate with no overtime compensation to these workers was made in good faith;

   c. Whether Diamondback's violation of the FLSA was willful; and

   d. Whether Diamondback's illegal pay practice applied to the Putative Class Members.

119. Trahan and the Putative Class Members sustained damages arising out of Diamondback's illegal and uniform employment policy.

120. Trahan knows of no difficulty that will be encountered in the management of this litigation that would preclude its ability to go forward as a collective action.

121. Even if the issue of damages were somewhat individual in character, the damages can be calculated by reference to Diamondback's records, and there is no detraction from the common nucleus of liability facts. Therefore, this issue does not preclude collective treatment.

122. Diamondback is liable under the FLSA for failing to pay overtime to Trahan and the Putative Class Members.

123. Consistent with Diamondback's illegal day-rate policy, Trahan and the Putative Class Members were not paid the proper premium overtime compensation when they worked more than 40 hours in a workweek.

124. As part of its regular business practices, Diamondback intentionally, willfully, and repeatedly engaged in a pattern, practice, and/or policy of violating the FLSA with respect to Trahan and the Putative Class Members.

125. Diamondback's illegal day-rate policy deprived Trahan and the Putative Class Members of the premium overtime wages they were owed under federal law.

126. Diamondback was aware, or should have been aware, that the FLSA required it to pay Trahan and the Putative Class Members overtime premiums for all hours worked in excess of 40 hours per workweek.

127. There are many similarly situated Putative Class Members who have been denied overtime pay in violation of the FLSA who would benefit from the issuance of a court-supervised notice of this lawsuit and the opportunity to join it.

128. This notice should be sent to the Putative Class Members pursuant to 29 U.S.C. § 216(b).

129. Those similarly situated employees are known to Diamondback, are readily identifiable, and can be located through Diamondback's records.

## CAUSE OF ACTION
## VIOLATION OF THE FLSA

130. Trahan realleges and incorporates by reference all allegations in preceding paragraphs.

131. Trahan brings his FLSA claim as a collective action under 29 U.S.C. § 216(b).

132. Diamondback violated, and is violating, the FLSA by failing to pay Trahan and the Putative Class Members overtime.

133. Diamondback misclassified Trahan and Putative Class Members for purposes of the FLSA overtime requirements.

134. Trahan and the Putative Class Members were Diamondback's employees for purposes of the FLSA overtime requirements.

135. Diamondback was Trahan's and the Putative Class Members' employer under the FLSA. Diamondback suffered or permitted Trahan and the Putative Class Members to work for or on its behalf during the relevant period.

136. Diamondback failed to guarantee Trahan and the Putative Class Members a salary.

137. Diamondback failed to pay Trahan and the Putative Class Members overtime.

138. Diamondback knowingly, willfully, or in reckless disregard carried out this illegal pattern or practice of failing to pay Trahan and the Putative Class Members overtime compensation.

139. Diamondback's failure to pay overtime compensation to these employees was neither reasonable, nor was the decision not to pay overtime made in good faith.

140. Accordingly, Trahan and the Putative Class Members are entitled to overtime wages under the FLSA in an amount equal to 1.5 times their rate of pay, plus liquidated damages, attorney's fees and costs.

## JURY DEMAND

141. Trahan demands a trial by jury.

## PRAYER

WHEREFORE, Trahan, individually, and on behalf of the Putative Class Members respectfully requests that this Court grant the following relief:

> a. An order designating this lawsuit as a collective action and authorizing notice pursuant to 29 U.S.C. § 216(b) to the Putative Class Members to permit them to join this action by filing a written notice of consent;

b. A judgment against Diamondback awarding Trahan and the Putative Members all their unpaid overtime compensation and an additional, equal amount, as liquidated damages;

c. Issuance of a declaratory judgment that the practices complained of in this Complaint are unlawful under the FLSA;

d. An order awarding attorneys' fees, costs, and expenses;

e. Pre- and post-judgment interest at the highest applicable rates; and

f. Such other and further relief as may be necessary and appropriate.

Respectfully submitted,

By: */s/ Michael A. Josephson*
**Michael A. Josephson**
Texas Bar No. 308410
**Andrew W. Dunlap**
Texas Bar No. 24078444
**Lindsay R. Itkin**
Texas Bar No. 24068647
**JOSEPHSON DUNLAP, LLP**
11 Greenway Plaza, Suite 3050
Houston, Texas 77046
713-352-1100 – Telephone
713-352-3300 – Facsimile
mjosephson@mybackwages.com
adunlap@mybackwages.com
litkin@mybackwages.com

**AND**
**Richard J. (Rex) Burch**
Texas Bar No. 24001807
**BRUCKNER BURCH PLLC**
11 Greenway Plaza, Suite 3025
Houston, Texas 77046
713-877-8788 – Telephone
713-877-8065 – Facsimile
rburch@brucknerburch.com

**ATTORNEYS FOR PLAINTIFF**